1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF COLORADO

3
    Criminal Action No. 22-cr-00266-NYW
4

5     PEOPLE OF THE STATE OF COLORADO,

6           Plaintiff,

7           vs.

8     JUSTIN J. MOLL,

9           Defendant.

10  ----------------------------------------------------------------

11                     REPORTER'S TRANSCRIPT
                       EVIDENTIARY HEARING
12
    ----------------------------------------------------------------
13
               Proceedings before the HONORABLE NINA Y. WANG,
14  District Court Judge, United States District Court for the
    District of Colorado, commencing at 10:01 a.m. on the 14th day
15  of November, 2022, in Courtroom A502, Alfred A. Arraj United
    States Courthouse, Denver, Colorado.
16
                           APPEARANCES
17
    For the Plaintiff:
18  LINDA STANLEY, District Attorney, 11th JUDICIAL
    DISTRICT ATTORNEY'S OFFICE, 136 Justice Center Road,
19  Canon City, CO 81212

20  For the Defendant:
    VICTOR WILLIAM SCARPATO, III, and JASAND PATRIC MOCK,
21  Assistant U.S. Attorneys, UNITED STATES ATTORNEY'S OFFICE,
    1801 California Street, Suite 1600, Denver, CO 80202
22

23

24      JULIE H. THOMAS, RMR, CRR, 901 19th Street, Room A256,
          Denver, CO 80294, (303)296-3056  (CA CSR No. 9162)
25

               Proceedings reported by mechanical stenography;
                 transcription produced via computer.

1                          I N D E X

2    PLAINTIFF'S WITNESSES                                    PAGE

3    MICHAEL MCCULLEY
         Direct - Ms. Stanley                                  47
4        Cross - Mr. Scarpato                                  51
         Redirect - Ms. Stanley                                63
5    CLINTON COLLIER
         Direct - Ms. Stanley                                  65
6        Cross - Mr. Mock                                      72
         Redirect - Ms. Stanley                                75
7    STEVEN HANSEN
         Direct - Ms. Stanley                                  77
8

9    DEFENDANT'S WITNESS                                      PAGE

10   JUSTIN MOLL
         Direct - Mr. Scarpato                                 13
11       Cross - Ms. Stanley                                   29
         Redirect - M                                          43
12       Redirect - Ms. Stanley                                75

13

14                    EXHIBITS                 RECEIVED

15                       1                        18

16                       2
                                                 73
17

18

19   CLOSING ARGUMENTS                                        PAGE

     Ms. Stanley                                               81
20

21

22

23

24

25

1      (Proceedings commenced 10:01 a.m.,

2      November 14, 2022.)

3           THE COURT:  Thank you.  Please be seated.

4           We are on the record in 22-cr-266-NYW, People of the

5  State of Colorado versus Justin J. Moll.

6           Can I have appearances of counsel, please.

7           MS. STANLEY:  Linda Stanley for the People.

8           MR. SCARPATO:  Good morning, Your Honor.  Bill

9  Scarpato from the U.S. Attorney's Office on behalf of

10  Defendant Justin Moll.  This is my colleague Jasand Mock.

11           THE COURT:  Good morning.

12           We are here for an evidentiary hearing, but we have

13  some logistics to take care of first.  This morning my

14  courtroom staff handed me a witness list that now lists

15  four -- actually, five additional witnesses that were not

16  previously disclosed.  So let me ask the counsel for Defendant

17  Moll, do you-all have an objection to these witnesses?

18           MR. SCARPATO:  Good morning, Your Honor.  We don't

19  have an objection to them on the basis of their nondisclosure.

20  We do have some substantive objections to a subset of these

21  witnesses' testimony under the Rules of Evidence.  I'm happy

22  to address that or take the conversation however Your Honor

23  would like.

24           THE COURT:  Why don't you go ahead and address that.

25           MR. SCARPATO:  Sure.  So as to witnesses Collier and

1   McCulley, we have no objection.

2            THE COURT:  Okay.

3            MR. SCARPATO:  As to witnesses Sheriff McGraw, Deputy

4   Connell, and Corporal Hansen, we do have relevance objections.

5   We also have hearsay objections to Sheriff McGraw and Deputy

6   Connell.

7            THE COURT:  I'm sorry.  Can you slow down a little

8   bit?

9            MR. SCARPATO:  Sure.

10           THE COURT:  So you don't have objections to Collier

11  and McCulley; is that right?

12           MR. SCARPATO:  That's correct, Your Honor.

13           THE COURT:  Okay.  Now, with respect to Sheriff

14  McGraw?

15           MR. SCARPATO:  Thank you, Your Honor.  Sheriff

16  McGraw's testimony would not be relevant in this removal

17  proceeding.  The issues before the Court this morning are:

18  first, whether Inspector Moll was a federal officer at the

19  time of the charged conduct; second, whether he was acting

20  under color of his office; and, third, whether he has a

21  colorable defense of Supremacy Clause immunity.

22           And Miss Stanley will certainly correct me if I'm

23  wrong, but in conferral she's agreed that no real dispute

24  exists as to the first two issues.  So the only evidence we

25  need to hear today goes to whether there is a colorable

 1    Supremacy Clause defense.

 2            That immunity turns on whether the federal official,

 3    here Inspector Moll, had an objectively reasonable and

 4    well-founded basis to believe that his actions were necessary

 5    to carry out his duties.  And the Tenth Circuit has made it

 6    clear that this inquiry requires the Court to evaluate the

 7    circumstances as they appeared to the federal officer at the

 8    time of the act in question, rather than on the basis of a

 9    more subtle and detailed factual record down the line.

10            Sheriff McGraw's testimony and, for that matter,

11    Deputy Connell's and Corporal Hansen's would not go to the

12    circumstances as they appeared to Inspector Moll at the time.

13    None of these individuals, to include the Sheriff, had any

14    interaction with Inspector Moll on the date in question.  None

15    of them were privy to any conversations or communications

16    Inspector Moll had that day.  None of them observed his

17    driving, to our understanding.  And so any testimony that they

18    would give would simply be extraneous to the question at hand

19    this morning.

20            In addition, we do have hearsay concerns about

21    Sheriff McGraw, though that may make more sense to deal with

22    on a contemporaneous basis.  We've gotten a couple of

23    different explanations as to what Sheriff McGraw may testify

24    to today, so that I think would make sense more on a

25    question-by-question basis.

1          THE COURT:  All right.  Well, why don't we have

2     Miss Stanley address some of these issues and make a proffer

3     with respect to what you anticipate these various individuals

4     to testify to, because again this is the first time I'm seeing

5     any of these names, and it would be helpful to understand

6     where we are.

7          MR. SCARPATO:  And I'm sorry, Your Honor, before I

8     cede the podium, I should say we do have a sequestration order

9     in this case, and I believe a number of members of the gallery

10    are these witnesses who we are discussing.  So I just wanted

11    to note that for the record.

12         THE COURT:  Okay.  And so before we proceed we will

13    need to sequester them pursuant to Rule 615.

14         Miss Stanley.

15         MS. STANLEY:  Thank you, Your Honor.  In regards to

16    Corporal Hansen, Corporal Hansen is a corporal with the

17    Saguache County Sheriff's Office.  Corporal Hansen received a

18    call regarding a fire at a post office on July 16th of 2021,

19    and that was the same fire that the defendant, Mr. Moll, is

20    accused of running to on that day from Denver.  Corporal

21    Hansen would be able to inform the Court as to the nature of

22    the fire, the time of the fire, et cetera, because, as the --

23    the exhibits that defendant has submitted state the reasons

24    why individuals in the postal inspector's office can run

25    emergent and, more importantly, when they can't.  And what we

1   are looking to do is establish that that fire did not rise to

2   the level of the defendant's running code at that time to that

3   location considering the nature and the time that the fire had

4   occurred.

5          THE COURT:  But isn't the operative question not

6   whether or not the fire rose to that level but what Defendant

7   Moll's understanding of that incident was?

8          MS. STANLEY:  Correct, but we intend to also attempt

9   to diminish the credibility of that understanding, but without

10  the underlying facts of the fire itself it might be difficult

11  to do that --

12         THE COURT:  Okay.

13         MS. STANLEY:  -- without knowing for sure what had

14  happened from someone on scene, compared to what somebody has

15  said they thought at the time.

16         THE COURT:  Well, wouldn't the appropriate thing to

17  do would be to cross-examine Defendant Moll?

18         MS. STANLEY:  Yes, and we plan on doing that.

19  However, as I stated, the time that Defendant Moll was pulled

20  over, compared to the time that the fire had actually occurred

21  and the time it was actually put out, et cetera, along with

22  the time that other federal officers had arrived as well.

23         THE COURT:  Did Corporal Hansen have any interaction

24  with Defendant Moll?

25         MS. STANLEY:  He did not.

1           THE COURT:  Okay.  All right.  What about Sheriff

2    McGraw?

3           MS. STANLEY:  As I stated previously, Your Honor,

4    this incident happened July 16th of 2021.  However, the

5    defendant was not issued a summons for several weeks later.

6    Sheriff McGraw was the individual that had looked into the

7    case after Deputy or, I'm sorry, Trooper Collier had stopped

8    the defendant and, through his investigation, had decided to

9    issue that citation to the defendant.

10          THE COURT:  Okay.  So tell me exactly why, again,

11   that's relevant with respect to the issues that we are looking

12   at right now, which are:  one, what Defendant Moll believed;

13   and then, two, whether or not he is a federal law enforcement

14   agent; and then, three, whether or not he was within the scope

15   of his employment when he was running his emergency lights;

16   and then, four, I guess, whether or not having been in the

17   scope of employment, allegedly, and acting as a federal law

18   enforcement officer running his lights, whether or not the

19   Supremacy Clause would apply and justify removal in this case.

20          MS. STANLEY:  Your Honor, as what the defendant had

21   shown as exhibits states, that an individual who is running

22   code, even if he is technically on the clock or on duty, isn't

23   necessarily covered under the color of his official authority.

24   There are certain acts that still cannot be done, along with

25   abiding by all state laws, which the defendant's policy also

 1   states that they must abide by all state laws.  And the state

 2   law clearly was violated by Defendant Moll, and we intend to

 3   show that to the Court.  Therefore, he wasn't acting under the

 4   color of his official authority when he arbitrarily is running

 5   code only at certain times and then isn't running code anymore

 6   after he was stopped.

 7          THE COURT:  But isn't that, again, what you are

 8   having Sergeant Collier and Mr. McCulley testify to?

 9          MS. STANLEY:  Mr. McCulley was the original reporting

10   party, and Trooper Collier would be testifying as to his

11   conversation with the defendant at the time that he had

12   stopped him.  However, Trooper Collier did not observe any of

13   that reckless behavior that, later on, Sheriff McGraw was able

14   to investigate and come to the conclusion, during his

15   investigation, that he was going to ticket him for the

16   reckless driving.

17          THE COURT:  Okay.  What about Deputy Connell?

18          MS. STANLEY:  Your Honor, I don't see us calling

19   Deputy Connell at this time.

20          THE COURT:  Okay.  All right.

21          Mr. Scarpato.

22          MR. SCARPATO:  Thank you, Your Honor.  I believe the

23   arguments that we made previously stand.  The inquiry for this

24   morning is what was -- what information was present in

25   Defendant Moll's head as he made that drive from Denver to

1   Moffat, and the argument that you heard from Miss Stanley this

2   morning admits that these witnesses do not have information

3   that go to that central inquiry for purposes of removal today.

4           THE COURT:  Okay.  So because this is an evidentiary

5   hearing before the Court, I think the most efficient thing to

6   do is to have the testimony come in.  I will make

7   contemporaneous rulings on objections or reserve them.  Again,

8   this is before the Court.  And then when we issue the

9   appropriate ruling, we will either make further evidentiary

10  rulings and/or preclude certain testimony depending on what we

11  see and how the record develops.  Okay?  That seems like the

12  most efficient thing to do, and then it also gives us an

13  opportunity to avoid as much error as possible.  Okay?

14          MR. SCARPATO:  Understood.  Thank you, Your Honor.

15          THE COURT:  All right.  So who is going to be called

16  first today?

17          MR. SCARPATO:  Your Honor, we are going to call

18  Inspector Moll first.

19          THE COURT:  Okay.  So then the other witnesses in the

20  courtroom should proceed out of the courtroom.  We have a

21  witness room, I think, to the left or the right or maybe both.

22          MS. STANLEY:  Your Honor, are we allowed to have an

23  advisory witness with us?

24          THE COURT:  So is that advisory witness testifying?

25          MS. STANLEY:  Yes.

1          THE COURT:  So typically it is a representative of

2    the party.  So Rule 615 says that, at a party's request, the

3    Court must order witnesses excluded so they cannot hear other

4    witnesses' testimony, or the Court may do so on its own.  This

5    rule does not authorize excluding a person who is an actual

6    person, which is Defendant Moll, an officer or an employee of

7    a party that is not a natural person after being designated as

8    the party's representative by the attorney, and a person whose

9    presence a party knows to be essential to presenting a party's

10   claim or defense, or a person authorized by statute to be

11   present.

12          So are you thinking of a particular officer or

13   employee of the State of Colorado that is being designated as

14   the representative here?

15          MS. STANLEY:  No, Judge.  I was thinking Sheriff

16   McGraw, but we'll go ahead and pass on that.  Thank you.

17          THE COURT:  Okay.  Thank you.

18          All right.  Mr. Scarpato, when you are ready.

19          MR. SCARPATO:  Thank you, Your Honor.

20          Your Honor, defendant would call Inspector Moll to

21   the stand.

22       (The witness was sworn.)

23          COURTROOM DEPUTY:  Please be seated.

24          And please state your name, and spell your first and

25   last name for the record.

 1          THE WITNESS:  Justin Moll, J-u-s-t-i-n, Moll,

 2   M-o-l-l.

 3          THE COURT:  So during trial we have consistently

 4   allowed the witness to take off his or her mask.  So if you

 5   would like to do that, you may do so.

 6          I also heard from a juror, although we don't have a

 7   jury here, that it's oftentimes difficult for people to hear

 8   you ask questions or counsel to ask questions.  So if you

 9   would like to take off your mask while you are asking

10   questions to facilitate the court reporting, you also may do

11   so.

12          MR. SCARPATO:  Thank you, Your Honor.  I will do that

13   at your invitation.

14          And before I begin the questioning, we do have three

15   exhibits on our exhibit list.  They have been stipulated as to

16   admissibility, so I would offer those into evidence before we

17   begin.

18          THE COURT:  All right.  So typically what I do in

19   evidentiary hearings, as well as trials, Mr. Scarpato, is when

20   you are ready to introduce them, when the witness testifies to

21   them, you can move them into evidence.  I generally do not

22   allow exhibits to be moved in wholesale even when they are

23   stipulated to.

24          MR. SCARPATO:  Okay.  Thank you, Your Honor.

25   ///

1        **JUSTIN MOLL, THE DEFENDANT HEREIN, DIRECT EXAMINATION**

2    BY MR. SCARPATO:

3    Q.   Good morning, Inspector Moll.

4    A.   Good morning.

5    Q.   Could you please tell us who you work for.

6    A.   The United States Postal Inspection Service.

7    Q.   Is that USPIS, for short?

8    A.   Yes.

9    Q.   Is the USPIS a federal law enforcement agency?

10   A.   Yes, we are.

11   Q.   What's your title with USPIS?

12   A.   Postal inspector.

13   Q.   Were you employed as a postal inspector on July 16, 2021?

14   A.   Yes.

15   Q.   Where were you based as a postal inspector?

16   A.   Denver.

17   Q.   Was that true on July 16 of last year as well?

18   A.   Yes.

19   Q.   What did you do before you became a postal inspector?

20   A.   I was a state trooper.

21   Q.   Was that in Colorado or a different state?

22   A.   Different state.  Missouri.

23   Q.   Between your state and federal service, how many years

24   have you been in law enforcement?

25   A.   A little over ten.  I was a state trooper for six years,

1    postal inspector for a little over almost five, so 11.

2    Q.   Could you describe for the Court what USPIS does?

3    A.   So the Postal Inspection Service is the law enforcement

4    side of the post office.  Basically we protect the postal

5    assets, postal employees, and also the customers.  So that's

6    basically everybody in this room.

7    Q.   And to what extent at all does the work of USPIS involve

8    responding to and investigating crimes against U.S. post

9    offices?

10   A.   Any crime that happens among the employees or external,

11   like our buildings, as long as there's some nexus to the mail,

12   that's basically a crime that we would investigate.

13   Q.   As a U.S. postal inspector, could you describe what, if

14   any, investigative powers you have?

15   A.   So federal officer, basically you serve subpoenas, make

16   arrests, carry firearms, things like that.

17   Q.   So I'd like to discuss with you the morning of July 16,

18   2021, now.  Were you on official duty as a postal inspector

19   for USPIS that day?

20   A.   Yes, I was.

21   Q.   What happened that morning?

22   A.   Basically we were notified of a fire that happened in

23   Moffat.

24   Q.   What did you do when you received that report?

25   A.   Sorry.

1          I responded to the scene.

2     Q.  Did you have any communication with your supervisor about

3     who would respond to the scene?

4     A.  Yes.  I volunteered to go.

5     Q.  And did you receive any sort of instruction from your

6     supervisor about heading down to Moffat?

7     A.  Just respond to the scene.

8     Q.  And did you, in fact, go to Moffat that morning?

9     A.  I did.

10    Q.  Was that under the instruction of your supervisor?

11    A.  Yes, it was.

12    Q.  What time did you leave for Moffat from Denver?

13    A.  A little after 9 o'clock.

14    Q.  And at the time you left, what information did you have

15    about the status of the scene in Moffat?

16    A.  Very limited.  We were just told that there was a fire.

17    Q.  And before you left, or in the early parts of your drive,

18    did you try to get any more information about the status of

19    the scene in Moffat?

20    A.  So prior to leaving I tried to notify the supervisor of

21    that post office.  I left her a voicemail message with my

22    contact information.  I said that I was en route; if anything

23    changed, please call me.

24    Q.  In your mind, is an arson a serious crime?

25    A.  Yes, it is.

22-cr-00266-NYW                  Moll - Direct                  11/14/2022    16

1    Q.  And so on the morning of July 16, 2021, was it important

2    to you to get to Moffat as quickly as you safely could?

3    A.  Yes, it would be.

4    Q.  Why is that?

5    A.  At the time, again, very limited cell service in that

6    area.  I attempted to make contact to the supervisor; no

7    response.  Whether the fire was still active or not, it's

8    going to be my duty to investigate that, so I'm also worried

9    about scene contamination or evidence destruction.

10   Q.  And was there any particular concern you had on that day

11   about evidence being lost if you didn't get there quickly?

12   A.  So prior to my drive down there, I checked the weather.  I

13   noticed that it was going to rain that day.  The conditions

14   were clear other than the rain.  I didn't want, for a fire,

15   the rain to contaminate the evidence.

16   Q.  And at the time you left Denver, to what extent, if at

17   all, were you concerned that someone could have been hurt or

18   killed in the fire at Moffat?

19   A.  Again, I had no knowledge.  Also, knowing that it's a

20   federal facility, so a lot of times jurisdiction becomes an

21   issue.  State and locals do not have always permission on

22   federal property.  So I knew at this point, being that it was

23   a post office, this was going to be one of the cases that I

24   would do.

25   Q.  At the time you left Denver to what extent, if at all,

1    were you concerned that the suspect was at large?

2    A.  So prior to leaving we also found out that there were

3    several threats to this post office from a customer.  So,

4    again, I didn't know if the customer was the same person that

5    set the building on fire or anything like that.  It's very

6    limited knowledge because there was a lack of contact.

7    Whenever I tried to reach them, nobody answered.

8    Q.  So you leave Denver, I think you said, a little after

9    9:00 a.m. en route to Moffat.  Could you describe the vehicle

10   that you were in?

11   A.  So I was driving a 2020 blue Chevy Silverado.

12   Q.  And is that your personal vehicle, or is it a government

13   vehicle?

14   A.  It's a government vehicle.

15   Q.  Was it marked?

16   A.  No, it is not marked.

17   Q.  Was it equipped with lights and sirens?

18   A.  Yes.  It has a police package.

19   Q.  When you left Denver, did you use that vehicle's lights

20   and sirens?

21   A.  Yes, I did.

22   Q.  Why?

23   A.  Again, important to get to the crime scene possibly to

24   stop evidence destruction and things like that.

25   Q.  And to what extent, if at all, did you use those lights

1   and sirens to facilitate the movement of your vehicle through

2   traffic?

3   A.  That's exactly what I did, facilitate through the traffic.

4   Also alerting the public that I was coming, you know, things

5   like that.

6   Q.  Is using lights and sirens like that permitted under USPIS

7   policy?

8   A.  Yes, it is.

9           MR. SCARPATO:  Miss Alexander, I'd like to pull up

10  Exhibit 1, which has been stipulated for admissibility.

11          And, Your Honor, at this time I would offer it into

12  evidence.

13          THE COURT:  Any objection?

14          MS. STANLEY:  No objection, Your Honor.

15          THE COURT:  All right.  So admitted.

16      (Exhibit 1 admitted.)

17          MR. SCARPATO:  Thank you.

18  BY MR. SCARPATO:

19  Q.  So, Inspector, I'd like to direct your attention to the

20  third paragraph under section 2.9.10.1.  It's the paragraph

21  that begins:  *Emergency warning equipment must* [sic] *be*

22  *used* . . .

23          Inspector Moll, do you see that paragraph of this

24  Exhibit 1 called out on your screen in front of you?

25  A.  Yes, I do.

1    Q.  That paragraph says:  *Emergency warning equipment may be*

2    *used to facilitate the movement of Official Vehicles through*

3    *traffic, warn of hazards, and to stop vehicles to investigate*

4    *or arrest the occupants for activities and actions occurring*

5    *within the scope of employment for Postal Inspectors and*

6    *Postal Police personnel.*

7            Did I read that correctly?

8    A.  Yes.

9    Q.  Is this paragraph consistent with your understanding of

10   what USPIS policy permitted in July 2021 with respect to the

11   use of lights and sirens?

12   A.  Yes, it is.

13           MR. SCARPATO:  If we could call out the next

14   paragraph below that one.  It begins:  *Official Vehicles must*

15   *be driven . . .*

16   BY MR. SCARPATO:

17   Q.  And the first sentence of this paragraph says:  *Official*

18   *Vehicles must be driven with due regard for the safety of all*

19   *persons.*

20           Do you see that language, Inspector Moll?

21   A.  Yes, I do.

22   Q.  To what extent, if at all, did you comply with this policy

23   on your drive from Denver to Moffat on July 16, 2021?

24   A.  So, basically, also that's why you use the lights and

25   sirens, to alert people that you are coming.  I understand

1   that I'm in an unmarked vehicle, so I want the general public

2   to know that I'm a first responder responding to something.

3   And then, again, making the drive down there, making passes

4   that were safe to my safety and the motoring public.

5   Q.  Thank you.

6        MR. SCARPATO:  Miss Alexander, you can take that

7   down.  Thanks.

8   BY MR. SCARPATO:

9   Q.  Have you had training on how to safely navigate vehicles

10  through traffic with lights and sirens?

11  A.  Yes, I have.

12  Q.  Could you describe that training for the Court, please.

13  A.  So prior to being a postal inspector, I was a state

14  trooper for six years.  Prior to that, state police academy

15  was 26 weeks.  I did that training.  I went back to become an

16  accident reconstructionist, which was another two weeks, and

17  then advanced crash, which was another four weeks, basically

18  understanding how the vehicle works, also how to put a crime

19  scene back together whenever there's no vehicles, looking at

20  the skid marks, and different things like that.

21        And then after the state police, Postal Inspection

22  Service, another 14 weeks of training, same thing basically,

23  driving, making arrests, control tactics, things like that.

24  Q.  So let's talk about some of the particulars of your drive

25  to Moffat now.  What road did you take to get to Moffat?

1  A.  U.S. 285.

2  Q.  Was that southbound?

3  A.  Yes.

4  Q.  And you left about 9:00 or a little bit after 9:00 that

5  morning.  What time did you arrive in Moffat, if you did

6  arrive?

7  A.  Roughly 1 o'clock, a little -- 12:45, I believe.

8  Q.  At any time between when you left Denver and when you

9  arrived in Moffat did you make any detours of any kind for any

10  sort of personal reasons?

11  A.  No, I did not.

12  Q.  On your drive did you have any memorable interactions with

13  other drivers?

14  A.  Yes, I did.

15  Q.  Could you tell us about that?

16  A.  So on the drive down, there was the semi that flipped me

17  off on the drive down.

18  Q.  What were you doing when that -- the driver of that truck

19  flipped you off?

20  A.  I was making a pass.

21  Q.  I think there may be some discussion about the propriety

22  of that pass today, so I want to get into a little bit of the

23  details of where you did it.

24        How many lanes is 285 where you made that pass?

25  A.  That is one lane each way.

1    Q.   So two lanes total?

2    A.   Correct.

3    Q.   And is it an undivided or divided highway?

4    A.   It is not divided.

5    Q.   What kind of sight line did you have when you made that

6    pass?

7    A.   A clear, straight.

8    Q.   And, if you know, how wide are the lanes typically on a

9    U.S. highway?

10   A.   So U.S. highways have a standard.  They'd be 12 feet long

11   with a shoulder.

12   Q.   So is that 12 feet from the double yellow in the middle to

13   the end of the pavement on the edge?

14   A.   Correct.

15   Q.   So with a two-lane highway, that would be 24 feet of

16   pavement --

17   A.   Correct.

18   Q.   -- total?

19        And how wide are motor vehicles typically?

20   A.   Motor vehicles are approximately 6.5 feet wide.

21   Q.   How about semi trucks?  Are they the same or different?

22   A.   It's a little wider, 8.6.

23   Q.   So, to your understanding, how many vehicles can pass side

24   by side on a two-lane highway?

25   A.   So basically for emergency purposes you can actually have

1    three vehicles on a lane.  So like evacuation, if there was a

2    hurricane, different things like that, you can actually have

3    three vehicles abreast.

4    Q.  How do you know all that?

5    A.  Again, state trooper and being an accident

6    reconstructionist.  Every accident I worked, I worked

7    fatalities, so I would get called out, I would have to measure

8    each highway, different things like that.  The highways have a

9    standard thickness,  width, different things like that.  So

10   being this was a U.S. highway, it met those standards.

11   Q.  Correct me if I'm wrong, but I take it you had all that

12   knowledge and experience in July 2021 when you made that pass

13   of that trucker.

14   A.  SI did.

15   Q.  Did you swerve in front of that semi truck?

16   A.  No.

17   Q.  Did you run it off the road?

18   A.  I did not.

19   Q.  Do you have any idea why the trucker flipped you off?

20   A.  No idea.

21   Q.  When in the sequence of the pass did the trucker flip you

22   off?  Was it as you were passing or before or after?  Could

23   you describe that sequence for us?

24   A.  I had made the pass.  So the vehicle in front of me moved

25   over some.  I made that pass, and then I was already in front

1    of that vehicle whenever I saw him flip me off --

2    Q.  And what --

3    A.  -- from his side.

4    Q.  Sorry.  I didn't mean to interrupt your answer.

5         Why did you make that particular pass?

6    A.  Again, at the time the importance of getting to the scene.

7    With my emergency equipment activated, the vehicle in front of

8    me started to move over, acknowledging my presence, so I was

9    able to make that pass safely.

10   Q.  And when you made that pass, did you take into

11   consideration the safety of vehicles traveling in the opposing

12   lane?

13   A.  Correct.

14   Q.  In your assessment, were you able to make that pass

15   safely?

16   A.  Yes, I did.

17   Q.  Were you at all concerned that you might hit that truck

18   when you made the pass?

19   A.  No.

20   Q.  Were you trying to hit the truck?

21   A.  Absolutely not.

22   Q.  If you had hit that truck, would you have been able to do

23   your job down in Moffat?

24   A.  I would not have been.

25   Q.  Do you think you would be sitting in the witness stand

1    here today?

2    A.  I would be injured.  So I would only make the pass if it

3    was safe to do so.

4    Q.  So I understand that at some point after you made this

5    pass you, still during your drive to Moffat, you were stopped

6    by a state trooper.  Do I have that right?

7    A.  That is correct.

8    Q.  So let's talk a little bit about that encounter.

9         About what time was it that the trooper stopped you,

10   if you can remember?

11   A.  11:30ish.

12   Q.  And was that stop still on 285, or was that somewhere

13   else?

14   A.  That was still on 285.

15   Q.  And I take it -- well, I'll just ask you.

16        Were you still on your drive to respond to the arson

17   at Moffat at the time you were pulled over?

18   A.  I was.

19   Q.  When the trooper first pulled behind your vehicle, did you

20   understand immediately that it was his intention to pull you

21   over?

22   A.  No.

23   Q.  Why not?

24   A.  So on the drive there, there were several other emergency

25   vehicles on 285.  Approximately ten cars in front of me I

1  believe that there was an ambulance.  So at this point I

2  didn't know if he was turning around to proceed to an

3  accident, if he was helping escort the ambulance, or anything

4  like that.

5  Q.  Is there anything special about the vehicle that you were

6  driving that would have affected your ability to see what was

7  going on behind you?

8  A.  So I have a Chevy Silverado that has a camper shell.  I

9  have equipment in it.  I do not really have a rearview mirror.

10  I just have side mirrors.  So, again, with my emergency lights

11  activated, I really couldn't even hear the trooper behind me.

12  So it took me some time to realize whether he was going to

13  pass me or whether he was trying to pull me over.

14  Q.  And, to your recollection, did the trooper, in fact, have

15  his lights and sirens engaged?

16  A.  Uh, I think so.  I really couldn't tell.

17  Q.  So I'd like to ask you.  At any point between you left

18  Denver that morning and when the trooper pulled you over, did

19  you receive any new information that changed your

20  understanding of the status of things with the reported arson

21  down in Moffat?

22  A.  No, none.

23  Q.  Did the state trooper arrest you?

24  A.  No, he did not.

25  Q.  Did he write you a ticket?

 1   A.  No, he did not.

 2   Q.  Did the state trooper let you continue on your way?

 3   A.  He did.

 4   Q.  So the State may bring out some evidence or suggest this

 5   morning that you agreed with the trooper, in your conversation

 6   with him by the side of the road, that something along the

 7   lines that Denver to Moffat is a long drive and running lights

 8   and sirens is inappropriate for that amount of time, or

 9   something along those lines.  Do you recall having a

10   conversation with the trooper along those lines?

11   A.  I do recall a conversation about the distance.

12   Q.  Did you agree with him at the time with that principle

13   that you shouldn't have been running lights and sirens for

14   that long of a drive?

15   A.  I'm going to say agreeing is out of context.  Being a

16   state trooper prior, I understand that every second that you

17   are on the side of the road there is a chance you could get

18   hit.  So for my safety and his, I'm not going to argue

19   whether -- what my mission is and what his mission is.  Being

20   a state trooper, I understand what his mission is.  He doesn't

21   understand what mine is.  So, again, I'm not going to argue

22   roadside with him.

23   Q.  Was it your objective throughout the time of this

24   encounter still to get to Moffat as quickly as you safely

25   could?

1    A.   Correct.  There has been no update, so at this point I'm

2    still needed there.

3    Q.   Okay.  And I understand that when you left this encounter

4    with the state trooper, you did so without your lights and

5    sirens engaged.  Is that right?

6    A.   That is correct.

7    Q.   Could you explain for us why?

8    A.   Again, I didn't want to argue with the trooper.  He felt,

9    with his belief of the area, that lights and sirens was not

10   needed.  So, again, I didn't want to argue with him roadside,

11   delaying my time to get to Moffat even more.

12   Q.   So, Inspector Moll, I have just a couple last questions so

13   it's clear.

14        Was there any action you took on the morning of

15   July 16, 2021, from the time you left Denver to the time you

16   arrived in Moffat that you did for any reason other than

17   because you were a postal inspector responding to a report of

18   an arson at a post office?

19   A.   No.

20   Q.   Was it your belief at that time that all of your actions

21   were necessary to carry out your official duties in response

22   to the reported arson?

23   A.   Yes.

24   Q.   And as a law enforcement professional with over 10 years

25   of experience in the use of emergency vehicles, was there any

1   doubt in your mind that running lights and sirens was the

2   appropriate thing to do under the circumstances as they

3   appeared to you at the time?

4   A.   No doubt.

5   Q.   And as a law enforcement professional with over 10 years

6   of experience in the use of emergency vehicles, was there any

7   doubt in your mind that passing vehicles on U.S. 285 at the

8   times you did was the appropriate thing to do under the

9   circumstances as they appeared to you at the time?

10  A.   For my safety and the safety of others, I would have not

11  made a dangerous pass.

12        MR. SCARPATO:  Thank you, Inspector Moll.  Those are

13  my questions.

14        THE COURT:  All right.  Miss Stanley.

15                    **CROSS-EXAMINATION**

16  BY MS. STANLEY:

17  Q.   Good morning, Mr. Moll.

18  A.   Good morning.

19  Q.   You stated that you left Denver at around 9:00 o'clock in

20  the morning; right?

21  A.   Correct.

22  Q.   What time did you receive the call or did your office

23  receive the call?

24  A.   I don't --

25        MR. SCARPATO:  Objection:  foundation.

```
 1              THE COURT:  Could you rephrase, Miss Stanley.
 2    BY MS. STANLEY:
 3    Q.  At what time did your office receive the call?
 4              MR. SCARPATO:  Objection:  foundation.
 5              THE COURT:  Sustained.
 6              So can you lay the predicate question --
 7    BY MS. STANLEY:
 8    Q.  Did your office receive a call regarding the fire in
 9    Moffat?
10              MR. SCARPATO:  Objection:  foundation.
11              MS. STANLEY:  Judge, I believe he had testified his
12    office received a call.
13              THE COURT:  Can you just simply ask him if he knows?
14    BY MS. STANLEY:
15    Q.  Do you know if your office received a call?
16    A.  Yes, we did.
17    Q.  Do you know what time your office received the call?
18    A.  I do not know.
19    Q.  Do you know what time you were told?
20    A.  I believe I was -- saw an e-mail roughly around 7:30,
21    8 o'clock stating that there was a fire.
22    Q.  And the fire was where?
23    A.  In Moffat.
24    Q.  And Moffat is three and a half hours away; correct?
25    A.  Yes.
```

1  Q.  And the e-mail came out at 7:30 to 8 o'clock, you stated?

2  A.  I believe that was the time.

3  Q.  But you waited over an hour to leave?

4  A.  I had to get ready.  Also during that time I fueled my

5  vehicle.

6  Q.  Well, you had testified that you believed that you needed

7  to get there to secure the scene; correct?

8  A.  That is correct.

9  Q.  But it took you at least an hour to leave from the time of

10  the e-mail.

11  A.  Again, I don't think that's highly accurate.  Again, I

12  said around 7:30 to 8:00.  I don't know exactly what time I

13  received the e-mail, but once I saw that notification there

14  was some dialect with my supervisor who was going to go.  So

15  just because I received the e-mail doesn't mean that I'm

16  going.  I need to get permission from my supervisor to go.

17  Q.  Did you get permission from your supervisor?

18  A.  I did.

19  Q.  Did you get permission from your supervisor to run lights

20  and sirens there?

21  A.  That is not part of our policy.  I don't get permission.

22  Q.  And did the e-mail state what time the fire had occurred

23  in Moffat?

24  A.  Negative.  No.

25  Q.  You had stated as well, during your testimony, that other

1   federal agents were responding.  Right?

2   A.  Yes.

3   Q.  And that would include ATF?

4   A.  I did not know who.

5   Q.  Did you have a radio or any other means of communication

6   with other officers in your vehicle?

7   A.  Communication with my dispatch, but not necessarily other

8   officers.

9   Q.  Well, if you had communication with your dispatch, your

10  dispatch could have notified other officers for you; correct?

11  A.  I don't know what the dispatch did or didn't do.

12  Q.  And you had a cell phone with you; correct?

13  A.  Correct.

14  Q.  You stated, during your testimony, you left a voicemail

15  for the postal -- postmaster, excuse me, on her voicemail, the

16  postmaster from Moffat.  Correct?

17  A.  It was not postmaster.  I said supervisor.

18  Q.  Supervisor.  Okay.

19  A.  Correct.

20  Q.  And your testimony was you left a voicemail for her saying

21  you were on your way.

22  A.  Correct.

23  Q.  Did your voicemail also say that you were running codes?

24  A.  No.

25  Q.  But your voicemail said to let me know if there's any

1    changes; correct?

2    A.   Correct.

3    Q.   Did your voicemail ask her to call you with status

4    updates?

5    A.   I gave her my information, to call me if there was any

6    change.

7    Q.   Change from what?

8    A.   The limited information that I had at the time.

9    Q.   Did you give her the limited information you had at the

10   time?

11   A.   I didn't give her limited information.  She was the one

12   that called us, I believe.

13   Q.   I thought it was an e-mail that you stated in your

14   testimony.

15   A.   That's how I was notified.  Whenever she calls the agency,

16   she would have called the 800 number, and that would have went

17   to a dispatcher.  So I didn't get information directly from

18   her.

19   Q.   When were you aware that she had called?

20   A.   Roughly whenever I received the e-mail.  Again,

21   8 o'clockish.

22   Q.   And you stated that you had been a postal inspector for

23   approximately five years?

24   A.   Yes.

25   Q.   How many times in that five years have you run code?

1   A.  Several.

2   Q.  About?

3   A.  Five or six times.

4   Q.  In five years?

5   A.  Yeah.

6   Q.  Perhaps once a year or so?

7   A.  Possibly.

8   Q.  And how many times did you run code for over an hour?

9   A.  I don't know.  There's been, again, several times.  The

10  last one I can remind -- remember, we went to Longmont for a

11  homicide.

12  Q.  Okay.  And how far is Longmont from Denver?

13  A.  I mean, I think -- again, it's not always from Denver.

14  Q.  Well, how far is Longmont from Denver?

15  A.  I would say an hour.

16  Q.  Okay.  Do you know how far it is to Moffat from Denver?

17  A.  No, I do not.  Three and a half hours.

18  Q.  You stated that all you knew was that there was a fire at

19  the post office, and it's federal property which sometimes

20  isn't open to the public?

21  A.  It's not that it's not open to the public.  Federal

22  property -- state and local sometimes cannot come on and

23  investigate on federal property.  There is a jurisdiction.

24  Q.  Correct, but the individual, including the supervisor and

25  a postmaster, are probably already there.  Correct?

1    A.  I don't know that.

2    Q.  Well, they would live close or nearby to that post office,

3    wouldn't they?

4            MR. SCARPATO:  Objection:  speculation.

5            THE COURT:  You can answer.  Overruled.

6    A.  You don't have to live next to a post office to work in

7    it.  There are several people that drive an hour to two hours

8    away, because we need staffing.

9    BY MS. STANLEY:

10   Q.  Thank you.  I didn't say "next to."  I just said "nearby."

11   A.  Okay.

12   Q.  Do you think that they probably would have lived nearby,

13   in other words, closer than you were coming from Denver?

14   A.  I don't know where people live.

15   Q.  Okay.  And you are aware that there is a Saguache County

16   Sheriff's Department there; correct?

17   A.  I am not.

18   Q.  You are not aware that there's a fire department there

19   either?

20   A.  Again, I was told that there was a fire.  Certain places

21   have volunteer.  Certain places have paid.  I do not know this

22   county.  So knowing that it's federal property, I know that

23   it's going to be something that we are going to take care of.

24   I know that I'm not going to physically put out the fire, but

25   I also know that I'm physically probably going to respond to

1    it and collect evidence.  So it's not about me getting there

2    to put out the fire or anything.  I'm still going there to

3    collect evidence.

4    Q.  Correct.  I understand that you say you are going there to

5    collect evidence, but driving, as your testimony stated, three

6    and a half hours, knowing there's likely a fire department and

7    other law enforcement there ahead of that time, wouldn't that

8    cause you to think it's no longer a need to collect evidence?

9    A.  Absolutely not.  There are several counties that don't

10   have after 8 o'clock -- I believe the county that you are from

11   after 8 o'clock there is nobody on watch.  It's only for

12   call-out.  So, from my knowledge as being a state trooper,

13   there are several counties that do not have 24/7 deputies.

14   Q.  Correct.  So they might not have 24/7 deputies on patrol;

15   correct?

16   A.  That is correct.

17   Q.  But there's always 911; correct?

18   A.  911, but who are they going to call after 911?

19   Q.  Right.  So what you are saying is you think you might have

20   been the first one to arrive on scene?

21   A.  Very possible.

22       MS. STANLEY:  Can I have one moment, Your Honor?

23       THE COURT:  Yes.

24   BY MS. STANLEY:

25   Q.  When you arrived on scene, the fire was well put out;

1    correct?

2    A.  Yes, it was.

3    Q.  There was other law enforcement on scene?

4    A.  Yes, there was.

5    Q.  There was fire on scene?

6    A.  Fire was already gone, I believe.

7    Q.  So when did you become aware that the fire actually

8    occurred at 4 o'clock in the morning?

9    A.  I -- not even until after I was there.  I didn't know what

10   time it happened.

11   Q.  Did you attempt to call any law enforcement in Saguache

12   County to figure that out?

13   A.  Not during my drive, no.

14   Q.  Did you try to call any other federal agents, such as ATF,

15   that were also responding?

16   A.  Not until after my arrival.

17   Q.  Would it surprise you if you found out ATF was not running

18   code and you were?

19   A.  I don't -- I can't speak for ATF policy.

20   Q.  Would it surprise you?

21   A.  I don't think so.

22   Q.  So you are saying it was okay for you to run code that day

23   but not ATF; correct?

24          MR. SCARPATO:  Objection:  foundation.

25          THE COURT:  Sustained.

1   BY MS. STANLEY:

2   Q.  If the fire happened around 4 o'clock in the morning --

3   you stated you arrived at 1:00 in the afternoon.  Is that

4   right?

5   A.  Yes.

6   Q.  That would have been about nine hours later?

7   A.  I arrived at 4:00 [sic].  Again, I don't know what time

8   the fire started or was even put out.

9   Q.  Correct.  If the fire started at 4 o'clock in the morning

10  approximately, you would have arrived nine hours later;

11  correct?

12  A.  I don't know what time the fire started.  When it -- at

13  this time I did not know what time the fire started.

14  Q.  I understand that.  What I'm trying to ask you is:  If it

15  started at 4 o'clock in the morning with your arrival, by your

16  own testimony, at 1:00, it would have been nine hours after

17  the fire.

18          MR. SCARPATO:  Objection, Your Honor.  At this point

19  we have had a long discussion about matters not having to do

20  with Inspector Moll's drive down to Moffat, and he's been

21  charged with reckless driving, so I'm going to make a

22  relevance objection here.

23          THE COURT:  I'm going to overrule you.

24          Inspector Moll, you can answer the question.

25          But once he's answered it, Miss Stanley, you need to

 1    move on.

 2            MS. STANLEY:  I will.  Thank you, Your Honor.

 3    A.  Yes.

 4    BY MS. STANLEY:

 5    Q.  Let's talk for just a moment about your interaction with

 6    the truck driver that you stated had flipped you off.  And you

 7    stated that you had attempted to pass a vehicle that was

 8    starting to move over.  So you had started to pass it when the

 9    truck driver flipped you off; correct?

10            MR. SCARPATO:  Objection.  That misstates the

11    evidence or testimony.

12            THE COURT:  Overruled.  Go ahead.

13    A.  Can you ask that again?

14    BY MS. STANLEY:

15    Q.  Yes.  You stated that you were attempting to pass a

16    vehicle, and as that vehicle had moved over and you were

17    passing is when the truck driver flipped you off.  Is that

18    correct?

19    A.  No.  I had already passed that vehicle when he had flipped

20    me off.

21    Q.  So you were past the vehicle completely in a lane all by

22    yourself when the truck driver flipped you off?

23    A.  Yes.

24    Q.  And what's the speed limit there in that area?

25    A.  I believe it's 60.

1  Q.  Well, you're required to abide by all speed limits;

2  correct?

3  A.  Yes.

4  Q.  But you are not sure what the speed limit is there?

5  A.  Again, I don't know exactly what part where the truck

6  driver was.  If you give me a mile marker exactly, we could

7  find out, but you're asking me when the truck driver passed me

8  or flipped me off.  I don't know exactly where that was.

9  Q.  So I asked you what the speed limit was in that area on

10  285.

11  A.  I believe it's 60.

12  Q.  And so all of those vehicles that you passed were going

13  under the speed limit?

14  A.  I do not -- I can't answer that.

15  Q.  Well, if you can't exceed the speed limit, but you passed

16  several vehicles, under your own testimony, they must have all

17  been going under the speed limit.  Correct?

18  A.  I don't have the equipment to measure everybody else's

19  speed, so I really can't speak for somebody else's vehicle,

20  ma'am.

21  Q.  You are stating that a truck driver -- even, let's say, at

22  60 miles an hour you were able to see a truck driver on a

23  two-lane road stick out his hand and flip you off while you

24  were driving code?

25  A.  He's driving the other way.  I can't -- I can't determine

```
 1    his speed.

 2    Q.  Right, but it's basically a split second between passing

 3    vehicles, isn't it?

 4    A.  It's not a split second to pass a vehicle.

 5    Q.  Okay.  Let's talk about your interaction with the trooper

 6    then.

 7              You admitted that even though the trooper was behind

 8    you, you didn't pull over?

 9    A.  I saw the trooper make the flip.  I could not see his

10    emergency equipment.  I couldn't hear his equipment because I

11    had mine on.

12    Q.  Okay.  So at what point did you -- or were you ever able

13    to see his lights and/or siren?

14    A.  Again, I could never hear his siren because I had mine on.

15    I noticed him trying to pass me in my rear -- in my side

16    mirror.  So I noticed the vehicle behind me trying to pass me.

17    So, again, while I'm driving, I'm looking forward and in my

18    mirrors.  And I noticed that he was trying to get aside me but

19    not pass me.  So from my prior experience as a state trooper,

20    I saw him make the flip, I decided to pull over knowing that I

21    was in an unmarked vehicle.

22    Q.  And approximately how long was he behind you, then, if you

23    saw him flip before you actually pulled over?

24    A.  I would say 2 -- 2 minutes, 2 to 3.

25    Q.  Okay.  And during your testimony previously, you stated
```

22-cr-00266-NYW                Moll - Cross                11/14/2022    42

1    that you weren't going to argue with the trooper and that's

2    why you left without your lights and sirens on.  Is that

3    right?

4    A.  That is correct.

5    Q.  So is that when the emergency situation that you thought

6    was going on in Moffat also ended?

7    A.  No, it did not.

8    Q.  Well, if it didn't end, then why weren't you running code

9    anymore?

10   A.  I was still expediting there.  Um, I just didn't have my

11   lights on because, again, I wasn't going to argue with the

12   trooper.  I didn't know if he was behind me.  I'm not going to

13   make something more than it is.

14   Q.  Did all of a sudden the time limit change for you to be

15   able to collect the evidence in Moffat?

16   A.  No.  I was still responding.

17   Q.  Correct, but you were no longer responding running lights

18   and sirens; right?

19   A.  Correct.

20   Q.  And you said you were running lights and sirens because

21   you had to get there to collect evidence; correct?

22   A.  Not necessarily to collect evidence.  To secure the scene.

23   To do what I need to do.

24   Q.  Whatever you thought it was you had to get there in a

25   hurry for ended after your contact with the trooper; correct?

Julie H. Thomas, RMR, CRR                              (303)335-2111

22-cr-00266-NYW            Moll - Redirect            11/14/2022    43

1   A.  It -- no.

2   Q.  But you weren't running code anymore; right?

3   A.  Would you define "code" for me, please?

4   Q.  Lights and sirens.

5   A.  I did not have my lights and sirens on.

6   Q.  Okay.  So your belief or in your mind the emergency

7   circumstance that you had to respond to Moffat had gone away

8   after your contact with the trooper?

9   A.  No, it did not.

10  Q.  But you were no longer running lights and sirens?

11  A.  That is correct.

12          MS. STANLEY:  I have nothing else, Judge.  Thank you.

13          THE COURT:  All right.  Mr. Scarpato.

14          MR. SCARPATO:  Thank you, Your Honor.

15                  **REDIRECT EXAMINATION**

16  BY MR. SCARPATO:

17  Q.  Inspector Moll, you were asked some questions about your

18  activities the morning of July 16, 2021, in between when you

19  first received an e-mail notifying you of the report to Moffat

20  and when you left Denver.  Do you remember that questioning

21  from earlier?

22  A.  Yes.

23  Q.  Was there anything that you did between when you read that

24  e-mail and when you left other than get ready to go to Moffat

25  and go?

Julie H. Thomas, RMR, CRR                        (303)335-2111

1  A.  Correct.  I was just waiting for a supervisor.  I

2  volunteered to go.  I wasn't necessarily given permission.  I

3  didn't know how many other people -- if there was enough

4  people going.  So, again, I was preparing to leave, but I

5  didn't leave until I received that notification.

6  Q.  And there was some questioning about what you were going

7  to do in Moffat once you got there.  Do you remember that

8  questioning?

9  A.  Yes.

10  Q.  Is it the role of a United States postal inspector to

11  investigate the scene of a crime?

12  A.  Yes.

13  Q.  Is it the role of a U.S. postal inspector to put out

14  fires?

15  A.  It is not.

16  Q.  Is it the role of a U.S. postal inspector, ordinarily, to

17  administer first aid or anything like that?

18  A.  Possibly if we would get there first.  First aid, that's a

19  necessary item.

20  Q.  What would you say your primary role is when you arrive at

21  a crime scene?

22  A.  Determining if it's secure, who needs to be contacted,

23  making calls like that.

24  Q.  And just so it's clear for the record, could you explain

25  for us why you weren't ready to rely on state and local

```
 1   authorities in this particular situation to do whatever it was

 2   you felt you needed to do in Moffat?

 3   A.  Again, from my experience as a state trooper, there are

 4   several counties that do not have 24-hour protection, so a lot

 5   of times either the state or federal government will be the

 6   first one there.  And also then it becomes an issue -- if

 7   something happened here in this courtroom, there's federal

 8   officers that take care of this.  City of Denver might respond

 9   as backup, but you can't always count on them.  So each agency

10   kind of has to take care of their own.

11   Q.  So just a couple of questions about your interaction with

12   the trooper.  Miss Stanley asked you some questions about your

13   decision not to use lights and sirens as you left that

14   encounter.  Do you recall that questioning?

15   A.  Yes, I do.

16   Q.  Was there anything about your interaction with the state

17   trooper by the side of the road on U.S. 285 that changed your

18   view about whether running lights and sirens and conducting

19   passes as you did along 285 up to that point was appropriate

20   for purposes of doing your job that day?

21   A.  No.

22   Q.  Did you want to get pulled over again?

23   A.  No.

24            MR. SCARPATO:  Thank you.  Those are my questions.

25            THE COURT:  All right.  Thank you, Inspector Moll.
```

1    You may step down.

2            Does the United States have any other witnesses?

3            MR. SCARPATO:  No, Your Honor.

4            THE COURT:  All right.  Miss Stanley.

5            MS. STANLEY:  Your Honor, we would call Mike

6    McCulley.

7            MR. SCARPATO:  And, Your Honor, as we are waiting for

8    Mr. McCulley to come into the room, we'd just like to say we'd

9    like to reserve the right to recall Inspector Moll if there's

10   any necessary rebuttal for this morning.

11           THE COURT:  All right.

12           COURTROOM DEPUTY:  If you could stand up here,

13   please.  Thank you.

14       (The witness was sworn.)

15           COURTROOM DEPUTY:  Please be seated.

16           THE WITNESS:  Judge, do you mind?

17           THE COURT:  Yes, Mr. McCulley, you may take off your

18   mask while you testify.

19           And, Miss Stanley, if you would like to take off your

20   mask, you may also take off your mask while you ask questions.

21           COURTROOM DEPUTY:  Please state your name, and spell

22   your first and last name for the record.

23           THE WITNESS:  Michael McCulley.  M-i-c-h-a-e-l, last

24   name M-c-c-u-l-l-e-y.

25   ///

1  **MICHAEL MCCULLEY, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

2  BY MS. STANLEY:

3  Q.  Good morning, Mr. McCulley.  Could you tell the Court what

4  you do for a living?

5  A.  I am a federal motor carrier.  I have a Class A commercial

6  driver's license.

7  Q.  How long have you been a Class A commercial truck driver?

8  A.  Well over three years, but I grew up on a farm driving a

9  truck, and you don't need a CDL to drive a truck on a farm.

10  Q.  Do you recall the date July 16th of 2021 you were working

11  as a truck driver on that date?

12  A.  Yes, ma'am.

13  Q.  Do you remember where you were coming from and to on that

14  date?

15  A.  I was coming from Elevation Brewery in Poncha Springs

16  headed to drops in Denver.

17  Q.  Have you driven that route on several occasions?

18  A.  Drive it about three times a day or -- or three times a

19  week for about a year.

20  Q.  On July 16th of 2021, you were heading back to Denver; is

21  that correct?

22  A.  Yes, ma'am.

23  Q.  What did you see off in the distance?

24  A.  I saw an unmarked full-size SUV, police car, with lights

25  and sirens.

1    Q.   And how far away was it when you first saw it?

2    A.   I would say quarter mile, a little bit more.

3    Q.   Since you were going the opposite direction of that

4    vehicle, explain what you saw.

5    A.   I saw the -- I saw the police -- or the unmarked police

6    officer with lights and sirens going, and, uh, he was weaving

7    in and out of traffic at a high rate of speed.  When he got

8    close to me, I took my truck and put it as far to the right as

9    I could.  And there's nothing there but a bar ditch.  I, uh --

10   Q.   Well, let's go back for a second, Mr. McCulley.

11          So was, to your estimation, the speed of the vehicles

12   on that road consistent with what the speed limit was?

13   A.   No, the --

14          MR. SCARPATO:  Objection:  foundation.

15          THE COURT:  Overruled.  Go ahead.

16   BY MS. STANLEY:

17   Q.   Was the speed of the vehicles on that road, meaning the

18   other vehicles besides yourself and the police car, around

19   what the speed limit was that day?

20   A.   The speed limit was 65 miles an hour at that part.  The

21   unmarked police officer that was coming toward me was well

22   exceeding the speed.  I know that by the travel of the

23   suspension, how it was coming at me, and how fast he was

24   weaving around other vehicles coming in my direction.

25   Q.   So if he had his lights and sirens on, approximately how

1   many vehicles did you see him pass?

2   A.  I would say two or three.

3   Q.  And out of those vehicles, how many of them had pulled

4   over and yielded?

5   A.  Well, the problem is that when you're traveling at that

6   rate of speed -- it's called a Doppler effect -- you can't

7   really hear the lights and sirens unless until they're real

8   close up on you.

9           So these people are trying to get on the side of the

10  road, but there's nowhere to go.  That part of 285 there's no

11  side of the road.  There's just a bar ditch.

12  Q.  How did you come in contact or almost contact with that

13  driver?

14  A.  He was coming at me.  Um, I'm sorry.  It's still -- it

15  kills me.  Um, when I looked up, I saw him go around one car,

16  and I downshifted, got in my Jake, looked over my right-side

17  mirror and saw how much room I had.  I barely had anything.  I

18  had the outside dual tires of the trailer off the road, and I

19  missed a mile marker sign by about this much.  He missed my

20  side of the truck by 6 inches.  And at the time I was well

21  over 79,000 pounds.

22  Q.  So do you recall what speed you were going?

23  A.  I was doing between 65 and 70.  The truck will not exceed

24  72 miles an hour.  It has a governor on it.

25  Q.  So are you stating that the driver -- the law enforcement

22-cr-00266-NYW                McCulley - Direct                11/14/2022    50

1    driver had drove down the middle of the road at that point?

2    A.  Yes.

3    Q.  And was that marked as passing or no passing?

4    A.  No passing.

5    Q.  So the law enforcement vehicle had passed three vehicles

6    at that point in a no-passing --

7    A.  Yes, ma'am.

8    Q.  -- zone?

9           And you said that it was an SUV.  Could it have been

10   a pickup truck with a topper on it instead?

11   A.  It's possible.

12   Q.  Okay.

13   A.  Again, I was trying not to kill him or die myself.

14   Q.  And then you called 911 after that; right?

15   A.  Yes, ma'am.

16   Q.  Why?

17   A.  I've got friends that are police officers.  I grew up in

18   North Carolina, and there's things that police officers do and

19   don't do.  And when you're going lights and sirens, you don't

20   put the public's safety at risk when you're not chasing

21   someone.  And I knew what he did was illegal and wrong.

22   Q.  In your years as a truck driver, how many times have you

23   seen law enforcement running code on the highways around?

24   A.  Hundreds.

25   Q.  And have you ever seen anything like that before?

22-cr-00266-NYW                    McCulley - Cross                    11/14/2022    51

1    A.  Never.  Not from a police officer.  Not even from anybody

2    driving down 285.

3    Q.  Did you flip off this driver of the vehicle as he went by

4    you?

5    A.  I don't recall.  I don't think I did.  I was too scared to

6    death.  I mean, I -- that was the scaredest I've ever been.

7    Hands down, that was the scaredest I've ever been in my life.

8            MS. STANLEY:  Nothing else, Your Honor.  Thank you.

9            THE COURT:  Mr. Scarpato.

10                        **CROSS-EXAMINATION**

11   BY MR. SCARPATO:

12   Q.  Good morning, Mr. McCulley.  My name is Bill Scarpato.

13   I'm here on behalf of the defendant today.

14           To your knowledge, you've never met Inspector Moll,

15   the man sitting at counsel table here with the blue shirt and

16   black-and-white tie, have you?

17   A.  I thought it was this guy.  No.

18   Q.  You've never had a conversation with him before?

19   A.  No, sir.

20   Q.  And the driver who you claim nearly ran you off the road,

21   you didn't have any idea what their reason was for driving on

22   U.S. 285 that morning, do you?

23   A.  I really don't care.  For anybody to drive that way,

24   there's not a legitimate reason unless somebody's life is at

25   risk.

1  Q.  My question was a little bit different, which was:  Did

2  you know why he was driving that day -- why they were driving

3  that day?

4  A.  No, I had no idea.

5  Q.  And you had no idea why that vehicle had its lights and

6  sirens on; right?

7  A.  No.

8  Q.  So you are not here to tell us what information was in

9  that driver's head at the time, because you don't know

10  anything about that; right?

11  A.  No, I do not.

12  Q.  When you were driving on 285 that morning, I take it that

13  was northbound back to Denver?

14  A.  Going back to Denver, yes, sir.

15  Q.  When were you due back in Denver?

16  A.  My first drop is before 1 o'clock.

17  Q.  And were you due back in Denver for that first drop before

18  1 o'clock?

19  A.  I really can't remember, because there's different

20  variables that go along with -- you know, does Elevation

21  Brewery have their stuff together?  That's my due date.  I can

22  drop as late as 4:30.

23  Q.  So due back in Denver at some point between 1:00 and 4:00?

24  A.  Well, hopefully before 1:00, but, you know, it's 285.

25  Q.  And if you get back before 1:00, is there any sort of

22-cr-00266-NYW          McCulley - Cross          11/14/2022    53

1   consequences to you --

2   A.  No.

3   Q.  -- or to your company?

4   A.  No, sir.  Not even if we are late.  You cannot -- you

5   know, when it comes to safety, you cannot manipulate or coerce

6   a federal motor carrier into speeding up or slowing down their

7   routes.

8   Q.  Did you have another run to make that day?

9   A.  No, that's it.

10          MS. STANLEY:  Objection, Your Honor:  relevance.

11          MR. SCARPATO:  Your Honor, this is relevant to show

12   that Mr. McCulley -- we need to establish if Mr. McCulley

13   needed to be somewhere by a certain time.  If we do, that

14   would go to his credibility as to whether he would have a

15   reason to be upset with anyone who caused him a delay.  It

16   could also be a reason for him to need an excuse as to why his

17   trip to Denver may have taken longer than expected.

18          THE COURT:  Okay.  I think that's pretty attenuated,

19   Mr. Scarpato, so I'm going to sustain the objection.  You can

20   ask a few questions directed toward whether or not he needed

21   to be somewhere or if he was late.

22          MR. SCARPATO:  Okay.

23          THE COURT:  This roundabout way is not the way to

24   accomplish it.

25          MR. SCARPATO:  Very good.  Thank you, Your Honor.  I

1   will move on.

2   BY MR. SCARPATO:

3   Q.  So you have looked at your mirrors.  To speak about this

4   interaction with this vehicle running lights and sirens, you

5   looked down at your mirrors, and you were checking your gauges

6   right before you looked up and saw the oncoming vehicle with

7   its lights and sirens on.  Correct?

8   A.  Correct.

9   Q.  When you looked up and saw it, was the vehicle already in

10  your lane?

11  A.  He was 50/50.  He was straddling the yellow line.

12  Q.  That's when you first saw it?

13  A.  Correct.

14  Q.  And how far off was the vehicle when you said that you saw

15  its lights and sirens running?

16  A.  Between, I would say, 500 yards, quarter mile, maybe an

17  eighth.  Again, this was over a year ago, well over a year

18  ago.  It's the best of my recollection.

19  Q.  How fast were you traveling when you first saw the lights

20  and sirens?

21  A.  Between 65 and 70.

22  Q.  So you were looking down.  You looked up, saw the lights

23  and sirens, and then you moved over to the right.  Right?

24  A.  I did my very best to move over to avoid killing him, yes,

25  and me.

22-cr-00266-NYW                McCulley - Cross                11/14/2022    55

1   Q.  And you didn't crash your truck that day; right?

2   A.  Thank God, I did not.  It would have killed me instantly.

3   Q.  And you didn't run off the pavement and into the ditch;

4   right?

5   A.  I did run off the pavement but not into the ditch.

6   Q.  And you made it to Denver that day; right?

7   A.  Yeah.  There was this much room.

8   Q.  Did you bring your vehicle to a stop after this encounter?

9   A.  I don't recall.  It's been a long time.

10  Q.  And you weren't hurt; right?

11  A.  Physically, no.  Emotionally, yes.  I'm still very much

12  distraught over this situation.

13  Q.  Was your vehicle damaged at all?

14  A.  No.

15  Q.  Now, on the date of this encounter you described, in your

16  direct examination, you had had your commercial driver's

17  license for about a year.  Is that right?

18  A.  Correct.

19  Q.  Do you have any specialized education or training or

20  experience on the subject of accident reconstruction?

21  A.  No.

22  Q.  How about with respect to the operation of emergency

23  vehicles in traffic?

24  A.  Yes.

25          MS. STANLEY:  Objection, Your Honor, as to relevance

1  again.

2          THE COURT:  Mr. Scarpato?

3          MR. SCARPATO:  Well, Your Honor, we have two

4  different stories about this pass.  One story believes the

5  pass wasn't safe.  The other story believes that the pass was

6  safe.  So at a certain point we need to understand where those

7  two perspectives come from, and that's what this testimony

8  goes to.

9          THE COURT:  Objection overruled.

10  BY MR. SCARPATO:

11  Q.  So, Mr. McCulley, do you have specialized education,

12  training, or experience on the subject of the operation of

13  emergency vehicles in traffic?

14  A.  Limited.  I attended SAGE tractor-trailer school.  I went

15  to an accredited school, and it's limited amount of training

16  when it comes to that.

17  Q.  And do you have any specialized education, training, or

18  experience on the subject of how emergency vehicles conduct

19  passes on a two-lane highway?

20  A.  Negative.

21  Q.  What's the name of the company you were driving for at the

22  time of your encounter?

23  A.  Denver Freight Express.

24  Q.  Are you still with that company?

25  A.  I am not.

22-cr-00266-NYW                McCulley - Cross                11/14/2022    57

1   Q.  When did you leave them?

2   A.  I don't recall the exact time or date.  It's been probably

3   a year and a half.

4   Q.  Why did you leave?

5           MS. STANLEY:  Objection, Your Honor, as to relevance

6   again.

7           MR. SCARPATO:  Your Honor, if he was -- well, I don't

8   know the answer to this question, and I'm interested to find

9   out, but if he was terminated from that position for any

10  reason due to his driving, that would go to his credibility

11  with respect to the propriety of this pass that occurred on

12  July --

13          THE COURT:  How would it go to his credibility about

14  what he was recalling as an eyewitness?

15          MR. SCARPATO:  It would go to his assessment of the

16  propriety of that pass and his judgment in that regard.

17          THE COURT:  Sustained.  Move on, Mr. Scarpato.

18          MR. SCARPATO:  Okay.

19  BY MR. SCARPATO:

20  Q.  What did you do before you were employed by Denver Freight

21  Express?

22          MS. STANLEY:  Objection, Your Honor:  relevance.

23          MR. SCARPATO:  I will move on.

24          THE COURT:  Sustained.

25  BY MR. SCARPATO:

22-cr-00266-NYW                McCulley - Cross                11/14/2022    58

1    Q.  So you mentioned federal motor carrier.  Are you subject

2    to FMCSA regulations as a driver?

3    A.  That is correct.

4    Q.  Are you a short hauler or a regular driver?

5    A.  I'm what you would call as local.

6    Q.  How long had you gone without a rest break that day when

7    you had this encounter with the emergency vehicle?

8                MS. STANLEY:  Objection, Your Honor:  relevance.

9                THE COURT:  Overruled.

10               THE WITNESS:  I don't know --

11               THE COURT:  You can --

12               THE WITNESS:  Go ahead and answer?

13               THE COURT:  You can go ahead and answer.

14   A.  Okay.  When I arrive -- I leave the shop at, like, 4:00 in

15   the morning, 3:00 in the morning, so that way when I get to

16   Poncha Springs I have a good hour, hour and a half, to take a

17   nap.  Then we load the truck off the tail, and I come back to

18   Denver.

19   BY MR. SCARPATO:

20   Q.  So had you been on duty since about 4:00 a.m. that

21   morning?

22   A.  Yes, sir.

23   Q.  How much driving had you done in the preceding 24 hours,

24   if you can recall?

25   A.  I don't recall.  I do know that we have a electronic

22-cr-00266-NYW                McCulley - Cross                11/14/2022    59

1    logging device in our vehicles, so if you do exceed any

2    federal motor carriers laws, it will shut the truck off

3    immediately and then notify dispatch.

4    Q.  Is that a Qualcomm system?

5    A.  Correct.

6    Q.  So, Mr. McCulley, I'd like to ask you just a few

7    housekeeping type of questions.

8              You submitted a Colorado State Patrol traffic

9    complaint form to CSP; is that right?

10   A.  Yes, sir.

11   Q.  And you signed that report on August 13 of 2021; right?

12   A.  I believe so.  I believe that's accurate.  I'd have to see

13   the document.

14   Q.  Would -- are you unable to remember that date that you

15   signed the report at this point?

16   A.  I remember signing the document.  I don't remember the

17   exact date, again, because it's been well over a year ago.

18   Q.  Would reviewing that report help refresh your recollection

19   about the date?

20   A.  Most likely it would.

21              MR. SCARPATO:  Your Honor, may I approach?

22              THE COURT:  You may.

23   BY MR. SCARPATO:

24   Q.  Mr. McCulley, I'll ask you to review that and let us know

25   when you have obtained the date that you signed that report.

22-cr-00266-NYW                    McCulley - Cross                    11/14/2022    60

1   A.  I signed it.  That is my signature.  I did sign this

2   document, signed it on 8/13 of '21 at 10:00 a.m.

3   Q.  All right.  And so that's, gosh, what, nearly a month

4   after this purported encounter on U.S. 285?  Right?

5   A.  Roger that.

6   Q.  What prompted you to file that report so long after the

7   incident?

8   A.  It ate at me.  I'm a licensed skydiver.  I raced

9   motocross.  I rode a Harley Davidson here this morning.  This

10  is the scaredest I have ever been in my life, and it still

11  affects me to this day when I drive a car.  Whenever I see an

12  emergency vehicle coming at me, I pull way over more than I'm

13  supposed to, because this -- it messed me up.

14  Q.  Did anyone from the Sheriff's Office or the District

15  Attorney's Office tell you that they were looking for this

16  report to be filled out?

17  A.  Not to my knowledge.  I don't remember that.

18  Q.  Did anyone tell you what to write in that report?

19  A.  Oh, hell no.

20          THE WITNESS:  Excuse my language, Judge.

21  BY MR. SCARPATO:

22  Q.  Other than the traffic complaint form, you didn't submit

23  any other sort of documentation of this purported encounter to

24  any of the authorities, did you?

25  A.  I don't recall.

22-cr-00266-NYW                    McCulley - Cross                    11/14/2022    61

1   Q.  You didn't submit any dashcam video of this purported

2   encounter?

3   A.  No, I did not.  I tried -- I had a dashcam, and when --

4   the problem was that if you don't download it, it

5   automatically erases it.  The little chip thing on the side --

6   you've got to excuse me.  I'm stupid when it comes to this

7   stuff.  You need to weld something, I gotcha, but when it

8   comes to cell phones and stuff, I'm retarded.

9           Because I waited too long to pull the chip out, it

10  auto-deleted it, and it started from the beginning.  But I did

11  have dashcam video of the situation because of situations like

12  this.

13  Q.  When was it that you attempted to retrieve that video?

14  A.  I do not recall.

15  Q.  Do you know what the rerecord loop is on that video?

16  Like, how long do you have before it records over?

17  A.  I don't even have the thing anymore, sir.  It's been well

18  over a year.  I've actually upgraded to a Garmin.  It was,

19  like, 39 bucks at Wal-Mart.

20  Q.  When you went to retrieve that video, did you take it in

21  to somebody to get that video extracted?

22  A.  No, I was going to do it myself.  I used my girlfriend's

23  computer, and she tried to plug it in and then got into it.

24  She goes, Well, there's nothing here from that date.  I said,

25  Why?  She said, Because you didn't pull it out quick enough.

Julie H. Thomas, RMR, CRR                              (303)335-2111

22-cr-00266-NYW                   McCulley - Cross                    11/14/2022    62

1  Q.  So I'd like to ask you just a few questions about your

2  interactions, if any, with the Park County Sheriff's Office.

3  I know you called 911 on July 16, 2021.  Did you have any

4  separate conversation with the authorities on that day?

5  A.  A sheriff called me and asked me what happened.  I told

6  him what happened.

7  Q.  Do you recall the name of the person from the Sheriff's

8  Office?

9  A.  No, sir, I do not.  He asked me if I would be willing to

10  write a statement, would I be willing to testify to this fact,

11  and I said, Well, I'm a federal motor carrier, I don't have a

12  choice.

13  Q.  And after that conversation did you have any other

14  conversations with somebody from the Sheriff's Office?

15  A.  I don't recall.  It's been years -- or well over a year

16  and a half.

17  Q.  Just a couple similar questions about the District

18  Attorney's Office.

19       Did you have any communications at any point with

20  anyone from the District Attorney's Office about this case?

21  A.  Not until about two weeks ago.

22  Q.  What was the subject of that conversation?

23  A.  Telling me I was subpoenaed to show up here this morning.

24  Q.  Have you seen that subpoena?

25  A.  Yeah, I got it.  It came to me in the mail, and then I

Julie H. Thomas, RMR, CRR                              (303)335-2111

1   gave a copy to my employer, and now I'm here.

2   Q.  Who is your employer now?

3   A.  SWI Excavating.  Awesome company, man.  Love working for

4   them.  They are amazing.

5          MR. SCARPATO:  Great.  Those are my questions.  Thank

6   you.

7   A.  No more mountain riding.  Done with that.

8          THE COURT:  Miss Stanley, anything further for this

9   witness?

10          MS. STANLEY:  Just briefly, Your Honor.

11                    **REDIRECT EXAMINATION**

12   BY MS. STANLEY:

13   Q.  Mr. McCulley, when you were on 285 that day and you

14   observed this law enforcement officer attempting to pass, you

15   stated that was in a no-passing zone?

16   A.  Correct.

17   Q.  Is that your previous testimony?

18          How do you know it was a no-passing zone?

19   A.  Solid yellow line.  Two solid yellow lines.

20          MS. STANLEY:  That's all I have, Your Honor.  Thank

21   you.

22          THE COURT:  All right.  Thank you, Mr. McCulley.  You

23   may step down.

24          Any reason that I can't release this witness?

25          MS. STANLEY:  There is no reason, Judge.

1           MR. SCARPATO:  No, Your Honor.

2           THE COURT:  All right.  Then you are excused,

3   Mr. McCulley.  Thank you.

4           THE WITNESS:  Thank you, Judge.

5           THE COURT:  Miss Stanley.

6           MS. STANLEY:  Your Honor, we'll call Trooper Collier

7   to the stand.

8           THE COURT:  I think Mr. McCulley may have a question

9   for you.

10          MS. STANLEY:  I'm sorry?

11          THE COURT:  You may proceed to get the witness.

12          MS. STANLEY:  Thank you.

13          COURTROOM DEPUTY:  If you can stand up here, please.

14      (The witness was sworn.)

15          COURTROOM DEPUTY:  Please be seated.

16          THE WITNESS:  I'll try.

17          THE COURT:  Trooper, if you would like to take off

18  your mask while you are testifying, you are welcome to do so.

19          THE WITNESS:  Thank you, Your Honor.

20          COURTROOM DEPUTY:  Please state your name, and spell

21  your first and last name for the record.

22          THE WITNESS:  My name is Clinton Collier.

23  C-l-i-n-t-o-n, C-o-l-l-i-e-r.

24  ///

25  ///

1    **CLINTON COLLIER, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

2    BY MS. STANLEY:

3    Q.   Good morning, Trooper Collier.

4    A.   Good morning.

5    Q.   Could you please state your occupation.

6    A.   I am currently a sergeant with the Colorado State Patrol.

7    Q.   How long have you been a sergeant with the Colorado State

8    Patrol?

9    A.   I have been a sergeant with the state patrol since July.

10   I have been employed as a trooper with them for the previous

11   10 or so years.

12   Q.   Do you have any prior law enforcement experience?

13   A.   No, ma'am.

14   Q.   Were you working as a trooper for the Colorado State

15   Patrol on July 16th of 2021?

16   A.   Yes, ma'am.

17   Q.   Do you recall getting a report or a dispatch call for a

18   BOLO?  And, if so, could you describe what that is?

19   A.   Yes.  I was working that day just as a trooper assigned to

20   the Chaffee County area, and we received a call via our Pueblo

21   regional communications center over the radio to be on the

22   lookout, or a BOLO, for a blue or Chevy Suburban or Tahoe that

23   was running lights and sirens that had a traffic complaint

24   called in against him.

25   Q.   And were you eventually able to locate that vehicle?

1   A.   Yes, ma'am.

2   Q.   Were you given a direction of travel for that vehicle?

3   A.   Yes.

4   Q.   And when you were able to locate it, was it going that

5   direction?

6   A.   Yes.

7   Q.   How long did it take you to locate the vehicle?

8   A.   I received the call at 11:21 via the radio in my car.  I

9   believe the contact happened at about 11:36, if my memory.

10  Q.   And when you located the vehicle, what did you do?

11  A.   I went ahead and activated my lights, made a U-turn, and

12  tried to effect a traffic stop to ascertain as to who the

13  party was and why they were utilizing the lights and sirens

14  that I observed them using.

15  Q.   What traffic behaviors did you notice on the vehicle once

16  you were behind it?

17  A.   So once I got behind the vehicle, I noticed that he was

18  utilizing left-hand-turn lanes in order to bypass traffic.  He

19  was traveling at about between 45 and 60 miles an hour,

20  depending upon if there were gaps in traffic or not.  And

21  generally he was -- his lights and sirens were actually

22  indicating for the vehicles in front of him that were also

23  traveling southbound to move to the right.  And as he watched

24  them move to the right, he would gain another spot in traffic,

25  and so on and so forth and kind of leapfrogged his way

1    southbound down 285.

2    Q.  Was it your recollection that traffic was heavy at that

3    time?

4    A.  Yes, ma'am.

5    Q.  How long did it take the vehicle to pull over after you

6    had attempted to pull it over?

7    A.  From the time that I turned around and activated my lights

8    and got behind him, approximately two and a half miles.

9    Q.  Did you have a conversation with the driver of that

10   vehicle?

11   A.  I did.

12   Q.  And do you recognize that driver today?

13   A.  I do.

14   Q.  Could you point him out or identify an article of clothing

15   he's wearing?

16   A.  Yep.  So he is sitting at this table here wearing the blue

17   mask, gray suit, some sort of burgundy or teal thing on top of

18   his tie.

19           MS. STANLEY:  Your Honor, would the court record

20   please reflect that the witness did identify the defendant?

21           THE COURT:  So reflected.

22   BY MS. STANLEY:

23   Q.  And do you recall the conversation you had with the

24   driver, who was the defendant, of that vehicle?

25   A.  Yes.

1  Q.  And how did that conversation go?

2  A.  Well, I initially introduced myself as Clinton, a trooper

3  with the Colorado State Patrol, and I asked him as to what he

4  was doing.  And I advised him that we had received a traffic

5  complaint on him or for him in Park County.  He told me that

6  his name -- or that he was with the Postal Service and that he

7  was responding to a call in Moffat, Colorado.  And because I

8  didn't really deal with the Postal Service that much, I didn't

9  realize that they had a law enforcement division.  He actually

10  showed me his credentials, which I believe were in or on the

11  center console, and that he was responding to a call of a fire

12  that he had received earlier that morning in the Moffat Post

13  Office.

14  Q.  Do you know approximately how far away Moffat is from

15  Denver?

16  A.  About a three-hour drive, plus or minus.

17  Q.  Did the defendant tell you he was driving code for three

18  hours?

19  A.  No, he did not.

20  Q.  What did he tell you?

21  A.  When I asked him how long he had been driving emergent or

22  with his lights and sirens, he estimated about just in the

23  last hour, for the last hour or so.

24  Q.  Did you ask him why only for the last hour?

25  A.  No.

1   Q.  And did you have a conversation with the defendant

2   regarding running code to Moffat being so far away?

3   A.  Not necessarily in the context of Moffat being so far

4   away, but I asked him why he was utilizing his lights and

5   sirens, and it was -- the reason he gave me was something to

6   the effect of that he didn't believe that the scene was

7   secure, and he was using lights and sirens in order to get

8   there as quickly as he could in order to preserve evidence.

9   Q.  Did that seem like a legitimate reason to you?

10  A.  At the time, no.

11  Q.  Why?

12  A.  The reason why -- well, I asked him if he had reached out

13  to any local law enforcement there in the area to actually

14  have them secure the scene, and he wasn't sure if that call

15  had been made or not.  I, as a trooper, receive calls all the

16  time for service either from my home, from my office, or just

17  in my normal course of patrolling.  And, as an example, if I

18  were to just receive a call of a crash on Highway 285 at

19  milepost 142, and that's all I have, that to me is not enough

20  information in order to justify an emergent response based

21  upon my state patrol policy that I am burdened with as well as

22  current statute.  I would need to know more information to

23  justify an emergent response versus just driving in normal

24  flow of traffic.

25  Q.  So more information, in other words, about injuries or

1    possible injuries?

2    A.  Yep.  Our policy is very specific when it comes to that.

3    An emergent -- an emergency call is delineated in our policy

4    as an incident --

5            MR. MOCK:  Objection, Your Honor:  relevance.

6            THE COURT:  Sustained.  This isn't relevant.  It's

7    very interesting, Trooper --

8            THE WITNESS:  Sorry.

9            THE COURT:  -- but the question before me is whether

10    or not this case is removable.  We are not here to conduct a

11    little mini trial with respect to whether or not the defendant

12    was, in fact, driving recklessly or not.  So I'm going to have

13    your -- the attorney for the People of the State of Colorado

14    redirect you.

15            THE WITNESS:  Thank you.

16            MS. STANLEY:  Thank you, Your Honor.

17            THE WITNESS:  Sorry.

18    BY MS. STANLEY:

19    Q.  Trooper Collier, the defendant stated he had been running

20    code for approximately an hour; is that right?

21    A.  Yes, ma'am.

22    Q.  And do you know, from where you had stopped him, about

23    where an hour ago was?

24    A.  Approximately Jefferson, Colorado.

25    Q.  And do you know if the Highway 285 changes there in any

1    way whatsoever?

2    A.   Prior to Jefferson, they typically have two lanes

3    traveling in one direction.  However, Jefferson starts to move

4    more into the rural side of Highway 285 in which it's one lane

5    headed north, one lane headed south.  And there are a couple

6    of passing lanes optional, but they are only maybe a quarter

7    mile or less.  Typically 65 miles an hour.

8    Q.   From your observations of observing the defendant driving,

9    was he obeying the state laws?

10   A.   If he was an authorized user of an emergency vehicle

11   running with his lights and sirens, I would say yes.

12   Q.   And you quoted a statute.  Is that a Colorado Revised

13   Statute?

14   A.   Yes, ma'am.

15   Q.   And do you recall what it stated?

16   A.   I'm sorry?

17   Q.   Do you recall what it states, the statute?

18   A.   Yeah, so what we're referencing is Colorado Revised

19   Statute 42-4-108.  I believe there's five subsections.  The

20   one specifically that we have really focused on as part of my

21   training and the training that I give to my troopers of

22   subsection (4) in which it states that even though there are

23   certain exceptions to the Colorado state --

24        THE REPORTER:  I'm sorry?

25

1   A.   There are certain exceptions -- I'm sorry.  My mouth is

2   super dry.   There are certain exceptions to the law, meaning

3   that as an authorized emergency motor vehicle operator you are

4   allowed to exceed the posted speed limit, not fully stop at

5   red lights, stop signs, things of that nature.  However, none

6   of that, based upon subsection (4), allows you to drive in a

7   reckless manner disregarding the public safety.  And the end

8   of that subsection, again subsection (4), states that a person

9   who actually drives in a reckless manner shall still have to

10  face the consequences of those reckless actions.

11  BY MS. STANLEY:

12  Q.   One last question, Trooper Collier.  Do you recall --

13  since you were driving the opposite direction of the

14  defendant, do you recall passing at any time an ambulance that

15  was going on 285 before you were able to locate the

16  defendant's vehicle?

17  A.   No.

18            MS. STANLEY:  Thank you.  Nothing else.

19            Thank you, Your Honor.

20            THE COURT:  Mr. Mock.

21                        **CROSS-EXAMINATION**

22  BY MR. MOCK:

23  Q.   Good morning, Trooper Collier.

24  A.   Good morning, sir.

25  Q.   If you would bear with me for just a moment, I have asked

1    my colleague, Miss Alexander, to call up a video clip.

2              Can you see that video, Trooper Collier?

3    A.  Yes, sir.

4    Q.  Trooper Collier, does this appear to be the dashcam from

5    your car?

6    A.  Uh, yes, sir.

7    Q.  Okay.

8              MR. MOCK:  Your Honor, we would move to admit

9    Exhibit 2, the video of the dashcam from Trooper Collier's

10   vehicle.

11             THE COURT:  Any objection, Ms. Stanley?

12             MS. STANLEY:  No objection, Your Honor.

13             THE COURT:  So admitted.

14       (Exhibit 2 admitted.)

15             MR. MOCK:  Thank you, Your Honor.

16             Miss Alexander, you can take that down.

17   BY MR. MOCK:

18   Q.  Trooper Collier, from the time that you first saw

19   Inspector Moll's vehicle to the time that you and Inspector

20   Moll were stopped on the side of the road, did you drive with

21   due regard for the safety of others?

22   A.  Yes.

23   Q.  And Inspector Moll was southbound when you first saw him?

24   A.  Yes, sir.

25   Q.  You were northbound?

1    A.  Yes, sir.

2    Q.  You made a U-turn?

3    A.  Yes, sir.

4    Q.  And then you needed to catch up to Inspector Moll;

5    correct?

6    A.  Yes, sir.

7    Q.  And in order to do that, you accelerated to speeds in

8    excess of 85 miles an hour, didn't you?

9    A.  I'm not sure.  I don't know what the speed I used was.

10   Q.  Trooper Collier, did you review your written report before

11   testifying today?

12   A.  Yes, sir.

13   Q.  And that report was written on October 7th?

14   A.  Yes, sir, I believe so.

15   Q.  While you were behind Inspector Moll, you were in an area

16   where the posted speed limit was 65 miles -- sorry.  Pardon

17   me.  I misspoke, Trooper Collier.  You were in an area where

18   the speed limit was 60 miles an hour?

19   A.  Yes, sir.

20   Q.  And Inspector Moll's speed varied between 45 miles an hour

21   and 60 miles an hour; is that correct?

22   A.  Yes, sir.

23   Q.  And he was observing the laws?

24   A.  As far as operating as an emergency vehicle?  I'm not sure

25   I -- I don't know how to --

22-cr-00266-NYW                  Collier - Redirect                  11/14/2022    75

1   Q.  Trooper Collier, was Inspector Moll observing the laws for

2   operating as an authorized emergency vehicle?

3   A.  Within his lights and sirens, yes, sir.

4   Q.  And you didn't see him do anything reckless?

5   A.  Not at that moment, no.

6   Q.  And when you had gone to speak with Inspector Moll, he

7   told you it was his belief that the crime scene was unsecured

8   and he needed to get there to ensure the preservation of

9   evidence?

10  A.  Yes, sir.

11  Q.  And you did not write Inspector Moll a ticket?

12  A.  No.

13  Q.  You did not issue him a citation?

14  A.  That's correct.

15          MR. MOCK:  No further questions.

16          THE COURT:  Miss Stanley, anything further?

17          MS. STANLEY:  Thank you.

18                          **REDIRECT EXAMINATION**

19  BY MS. STANLEY:

20  Q.  Trooper Collier, following up on that last question,

21  you -- I'm sorry.  Let me rephrase.

22          The defendant stated to you it was his belief he

23  needed to get to Moffat in order to secure the scene?

24  A.  Yes, sir.  Sorry.  Yes, ma'am.

25  Q.  And stop me if I asked you this before.  Did that seem

Julie H. Thomas, RMR, CRR                              (303) 335-2111

22-cr-00266-NYW                  Collier - Redirect                  11/14/2022    76

1   like a legitimate reason?

2          MR. MOCK:  Objection:  relevance.

3          THE COURT:  Sustained.

4   BY MS. STANLEY:

5   Q.  Did the defendant continue to run code then after he left

6   the contact with you?

7   A.  From my line of sight, no.  He left the traffic stop

8   without his lights and sirens until he disappeared from my

9   line of sight.  I'm not sure what he did after I was no longer

10  in contact with him.

11         MS. STANLEY:  That's all I have, Your Honor.  Thank

12  you.

13         THE COURT:  All right.  Thank you, Trooper.

14         Any reason why I can't excuse the trooper?

15         MS. STANLEY:  No, Your Honor.  Thank you.

16         THE COURT:  Thank you very much.  You are excused.

17         THE WITNESS:  Thank you.  Would it be okay with the

18  Court if I sat in the gallery and listened to the rest?

19         THE COURT:  You may --

20         THE WITNESS:  Thank you.

21         THE COURT:  -- now that you have testified.

22         Miss Stanley, your next witness.

23         MS. STANLEY:  Your Honor, we'll call Corporal Steve

24  Hansen to the stand.

25         COURTROOM DEPUTY:  If you could stand up here,

Julie H. Thomas, RMR, CRR                              (303)335-2111

 1   please.

 2        (The witness was sworn.)

 3            COURTROOM DEPUTY:  Please be seated.

 4            Please state your name, and spell your first and last

 5   name for the record.

 6            THE WITNESS:  Steven Hansen.  Steven is S-t-e-v-e-n.

 7   Hansen is H-a-n-s-e-n.

 8            THE COURT:  Corporal Hansen, if you'd like to take

 9   off your mask while you testify, you are welcome to do so.

10            THE WITNESS:  Okay.

11       **STEVEN HANSEN, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

12   BY MS. STANLEY:

13   Q.  Good morning, Corporal Hansen.

14   A.  Good morning.

15   Q.  Could you please explain to the Court what you do for a

16   living.

17   A.  I'm a patrol supervisor for the patrol division with the

18   Saguache County Sheriff's Office.

19   Q.  How long have you been with Saguache County Sheriff's

20   Office?

21   A.  10 years.

22   Q.  Is Saguache County one of those counties that doesn't have

23   anyone on 24 hours a day?

24   A.  It is.

25   Q.  So what happens when there's an emergency?

22-cr-00266-NYW                    Hansen - Direct                    11/14/2022    78

1  A.  It's whoever is on call or the closest to the emergency.

2  Q.  Were you working as a Saguache deputy on July 16th of

3  2021?

4  A.  I was.

5  Q.  Did you receive a call?

6  A.  I did.

7  Q.  Do you remember what time it was?

8  A.  It was around, I want to say, 0430 in the morning.

9  Q.  Do you remember what the call was for?

10  A.  A fire at the Moffat Post Office in Moffat, Colorado.

11  Q.  Did you respond?

12  A.  I did.

13  Q.  Do you recall what time you got there?

14  A.  It was approximately 0440.

15  Q.  And what did you observe when you were there?

16  A.  The Moffat Fire Department was on scene, and by the time I

17  got there they had already extinguished the fire.

18  Q.  What did you do at that time?

19  A.  The fire department -- the fire department was still

20  mopping up.  They had a few hot spots in, I believe, one of

21  the exterior walls.  And I just remained on scene and spoke

22  with the fire chief and looked over the scene.

23  Q.  Did you know if anyone secured the scene?

24  A.  At that time it was -- Moffat Fire Department was the only

25  one on the scene until I arrived.

1    Q.  And then when you left, what did you do?

2    A.  When I left the scene?

3    Q.  Yes.

4    A.  I secured the scene the best I could with the outer door

5    and then placed crime scene tape over the outer door.

6    Q.  Do you remember what time you left?

7    A.  It was just after sunrise, so I'm going to say

8    approximately 0630, maybe 0700.

9    Q.  And did you make plans to go back later on in that day?

10   A.  I did once I had confirmation that a postal inspector

11   investigator was on the way.

12   Q.  Once you received that confirmation, what time did you

13   arrive back at the scene?

14   A.  I arrived on scene at approximately 1230 hours that same

15   day.

16   Q.  Who was there on scene with you?

17   A.  When I initially arrived, just the postmaster and another

18   gentleman who I didn't know what his function was.

19   Q.  You don't recall seeing the defendant there; correct?

20   A.  No, ma'am.

21   Q.  And eventually did other federal agents arrive besides the

22   defendant?

23   A.  Yes, ma'am.  I believe another postal inspector and three

24   ATF agents.

25   Q.  And do you recall if any of those federal agents were

```
 1   running code on their way there?

 2   A.  I --

 3           MR. MOCK:  Objection:  foundation.

 4           THE COURT:  Sustained.

 5   BY MS. STANLEY:

 6   Q.  Did you hear any of the federal agents as they were coming

 7   onto the scene?

 8   A.  No.

 9   Q.  Do you have any belief that they were running lights and

10   sirens?

11   A.  I do not.

12   Q.  Just to recall, the fire was out after you arrived on

13   scene the first time?

14   A.  The pri- -- primarily it was.  There was a few hot spots,

15   I believe, in one of the exterior walls.

16           MS. STANLEY:  I don't have anything else, Your Honor.

17   Thank you.

18           THE COURT:  All right.  Mr. Mock.

19           MR. MOCK:  We have no questions for this witness,

20   Your Honor.

21           THE COURT:  All right.  Thank you, Corporal Hansen.

22           Any reason why I can't excuse him?

23           MS. STANLEY:  No.  Thank you, Your Honor.

24           THE COURT:  You are excused.

25           THE WITNESS:  Thank you, Your Honor.
```

1          THE COURT:  Miss Stanley.

2          MS. STANLEY:  No other witnesses, Your Honor.

3          THE COURT:  All right.  So we will take limited

4    argument.

5          Mr. Mock and Mr. Scarpato, which one of you is doing

6    the argument?

7          MR. SCARPATO:  Your Honor, I don't know that we see

8    the need for a closing today, though if Miss Stanley wishes to

9    speak, we'd like a few minutes for rebuttal, if that's fine.

10          THE COURT:  That's fine.  Miss Stanley?

11          MS. STANLEY:  I'll be brief as well, Your Honor.

12          The particular section that was used as Defendant's

13    Exhibit No. 1, 2.9.10.1, Use of Lights and Sirens,

14    specifically states that it is not for personal convenience,

15    which is actually prohibited and outside the scope of

16    employment.

17          Also it states that the individual of the postal

18    inspector or postal police personnel are required to comply

19    with state and local regulations, including speed limits.  The

20    testimony today included at least one individual who testified

21    that the defendant was absolutely exceeding the speed limit.

22          Additionally, in that same section under Use of

23    Lights and Sirens it states that the vehicles must be driven

24    with due regard for the safety of all persons.  Mr. McCulley

25    was so upset and distraught by his interaction with the

1   defendant that he called 911 and several weeks later, when he

2   was notified, filled out a witness statement.

3        Going on in that same paragraph, it states that

4   personnel are not protected from consequences of an arbitrary

5   exercise of those privileges.

6        THE COURT:  All right.  So, Miss Stanley, I

7   understand that your argument is that this particular

8   defendant should be prosecuted for reckless driving, but I

9   really want to focus you on the questions that the Court has

10  to consider in terms of whether or not this is properly

11  removed to state court -- or to federal court, because that's

12  the first thing I need to do.  And then to the extent that

13  it's removed from state court to federal court, then there may

14  be a motion to dismiss based on supremacy on the part of the

15  government, or there may be a prosecution here.  But, again,

16  my understanding is I need to determine whether or not under

17  the statute this individual was proceeding under the color of

18  law, okay, within the scope of his employment.  And if you

19  could focus on that, that would be helpful.

20       MS. STANLEY:  Thank you, Your Honor.  I apologize.  I

21  was -- probably should have read that part last instead of

22  first.

23       The only other part I wanted to state, Judge, is that

24  the testimony revealed today that the defendant had not been

25  driving code the entire time and, in fact, after his contact

1    with the trooper was no longer running code to that scene.  If

2    his belief really was that he needed to get there right away

3    to collect evidence, secure the scene, anything like that,

4    then why did he only run code for the last hour before the

5    contact with the trooper, and why did he not run code anymore

6    after the contact with the trooper?  Why did he not make any

7    kind of phone calls to anybody in Saguache County regarding

8    whether or not he still needed to run emergent or not?

9           So it was an arbitrary use of lights and sirens,

10   which then removes him from the color of his official

11   authority.  He is now responsible for it personally.

12          Thank you, Your Honor.

13          THE COURT:  All right.  Anything else on behalf of

14   the defendant?

15          MR. SCARPATO:  I don't think so, Your Honor.  At our

16   last conference with you several weeks ago we spoke about the

17   potential for proposed findings of fact and conclusions of

18   law, and we might reserve any further argument to that time if

19   Your Honor is still up to proceed that way.

20          THE COURT:  So I will set a deadline for you all to

21   submit proposed findings of fact and conclusions of law.

22   Since this has been pending quite a while at this point, I'd

23   like those to be in -- and we have holidays coming up.  I'd

24   like those to be in within the next week so that we can make

25   an appropriate ruling on this matter.  So that would be

1   November 21st, 2022.

2          Anything further?

3          MS. ALEXANDER:  December, Your Honor?

4          COURT REPORTER:  I'm sorry?

5          MS. ALEXANDER:  Did you mean December, Your Honor?

6          THE COURT:  I don't think so.  A week is November.

7          MR. SCARPATO:  I would have a question, Your Honor,

8   with respect to transcripts, if we would have those available.

9          THE COURT:  That's a valid question.

10         Typically I think, Ms. Thomas, is the general

11  turnaround 14 days?

12         COURT REPORTER:  Ordinary delivery is 30 days.  They

13  can order expedited in 14, 7, or 3 days.

14         THE COURT:  I don't mean to create a budgetary issue

15  for the respective governments.  So that would be

16  mid-January -- or mid-December.  Then we have the holidays.

17  So what about proposed findings of fact and conclusions of law

18  no later than January 6, 2023?  That allows you to have a

19  normal turnaround time with respect to the transcript, have

20  some time over the holidays to actually enjoy the holidays,

21  and then submit those proposals no later than January 6th.

22         MR. SCARPATO:  That's fine for defendant, Your Honor.

23  Thank you.

24         THE COURT:  Miss Stanley?

25         MS. STANLEY:  Yes.  Thank you, Your Honor.

22-cr-00266-NYW          Evidentiary Hearing          11/14/2022   85

1           THE COURT:  All right.  So we will look forward to

2    those on January 6, 2023, and then we will get a ruling out as

3    soon thereafter as we can.  All right.

4           So we have concluded the evidentiary hearing.  Again,

5    we will anticipate your filings.  Thank you very much, and we

6    will be in recess.

7       (Proceedings concluded 11:38 a.m.,

8         November 14, 2022.)

9

                          REPORTER'S CERTIFICATE
10
            I, JULIE H. THOMAS, Official Court Reporter for the
11   United States District Court for the District of Colorado, a
     Registered Merit Reporter and Certified Realtime Reporter, do
12   hereby certify that I reported by machine shorthand the
     proceedings contained herein at the time and place
13   aforementioned and that the foregoing pages constitute a full,
     true and correct transcript.
14          Dated this 13th day of December, 2022.

15
                         _____/s/ Julie H. Thomas_____
16                        Official Court Reporter

17

18

19

20

21

22

23

24

25

Julie H. Thomas, RMR, CRR                              (303)335-2111